STATE of Missouri ex rel. OZARK LEAD COMPANY, Respondent,

v.

Gerald H. GOLDBERG, Director of Revenue of the State of Missouri, Appellant.

No. 62348.

Supreme Court of Missouri, Division No. 1.

Feb. 9, 1981.

Christopher M. Lambrecht, Asst. Atty. Gen., Jefferson City, for appellant.

Kelly Pool, Jefferson City, for respondent.

WELBORN, Commissioner.

Proceeding for reassessment of sales and use taxes. The Director of Revenue assessed sales and use taxes and penalties in the amount of $38,300.97 against Ozark Lead Company. The taxes were paid under protest and the taxpayer on August 8, 1976 filed a petition for reassessment pursuant to Section 144.200, RSMo 1969. The protest was heard by the Hearing Officer of the Department of Revenue on April 17, 1978. His decision, denying relief, was rendered April 6, 1979. Taxpayer filed a petition for judicial review in the Circuit Court of Reynolds County. Findings of fact, conclusions of law and judgment reversing the

decision of the Director of Revenue were entered by the Circuit Court on December 6, 1979. The Director has appealed.

In this Court the first complaint of the Director is that the final decision of the Director, having been rendered April 6, 1979, after the effective date of S.B. 661 of the 79th General Assembly, was reviewable originally by the Administrative Hearing Commission under Section 144.261, RSMo 1978, and, therefore, the circuit court had no jurisdiction to hear the matter. This contention has been answered in *Labrayere v. Goldberg*, 605 S.W.2d 79, 82–85[1][2] (Mo. banc 1980). The holding of that case, contrary to the contention of the appellant, is dispositive.

The only question presented is whether or not the purchases of machinery and equipment upon which the taxes were assessed are exempt from sales and use tax by reason of Section 144.030.3(4), as "Machinery and equipment * * * purchased and used * * * to expand existing * * * mining plants in the state * * *." The operative facts are not in dispute. The findings of the Department Hearing Officer set them out fairly as follows:

"Ozark Lead Company operates a deep underground mine near Sweetwater, Missouri. The mining horizon is approximately 1,000 feet below ground. The mine was opened in 1968 and produces Galena Sphalerite Ore. The ore is in a host rock dolomite or limestone. The Galena and Sphalerite are removed from the host rock and concentrated into a saleable product. * * * A wide, flat ore body was initially anticipated when this mine was opened but this ore was found to be very low grade. As a result of the ore not being located as it was originally thought, Ozark Lead's mining concepts had to change, and it was necessary for the mine to be developed vertically as well as horizontally and to be expanded laterally in order to mine the desired amount and quality of ore. As a result of the unanticipated location of the ore, some new

and different types of machinery had to be purchased since the old equipment was not designed for the new areas.

"Among the purchases here at issue is the purchase of (five) Load Haul Units. * * * Since it was necessary for the mine to be developed vertically as well as horizontally, it was necessary to construct numerous ramps in the mine, three or four ramps being required in every area of work. The new units had to be purchased since the load haul units had to be more powerful to negotiate these inclines and ramps. Furthermore, new load haul units are more versatile than the older units in that the new units can dump in holes below the units, in storage pockets above the railroad, or in railroad cars themselves. The older units could only dump in holes under the cars and additional dumping techniques had to be developed due to the changed nature of the mine. It is also possible for the new load haul units to stock pile ore and to keep the mine faces free for production. These more versatile units are required since that ore did not occur as originally anticipated and it was necessary to expand the mine vertically and horizontally to continue its operation.

"Changing ore body and the necessity of mining different types of areas also required the purchase of two Sien-Brute Powder Loading Boom Trucks. These are utility vehicles used to make mining faces safe and to load explosives in blast holes. As a result of the changing ore body, it was necessary to develop more drifts or tunnels in order to maintain production, and this necessitated the acquisition of the Boom Trucks. * * *

"The High Scaler-Sterling and the High Scaler-Pitman Aerial Platform * * were purchased as a result of the need to develop the vertical type ore. The older equipment was not capable of mining these vertical areas so that the newer equipment was essential. The older equipment could reach heights of only thirty feet and the new vertical development reached heights of ninety to ninety-five feet.

"As a result of the vertical and lateral expansion of the mine required by the unanticipated occurrence of the ore, it was necessary for Ozark Lead to expand the mine's underground transportation system. Ozark Lead purchased * * * fourteen (railroad) cars (which) were additional pieces of equipment required because of the geographical expansion of the mine. Because of the inaccessibility of the ore and the necessity of drawing ore from fourteen different locations, Ozark Lead was further required to purchase an additional locomotive. * * *

"In order to increase production efficiency Ozark Lead was further required to purchase the Particle Size Analyzer. This piece of equipment analyzes the size and consistency of the slurry as it comes out of the grinding circuit. The analyzer more efficiently monitors the grinding process and increased production capability from 250 to 280 tons per hour. * * *

"[P]roduction tonnage has in fact steadily declined from the year 1974 through and including 1977. Thus there has been no increase in production due to the purchase of the items of equipment here in dispute. Taxpayers argue however that the new equipment here in dispute is necessary to maintain production in the sense that if this equipment was not purchased, tonnage would have been substantially decreased.

"Taxpayer also alleged that the new equipment is capable of producing substantially more tonnage and that labor problems and mechanical problems have hindered this production."

According to appellant's brief, "The question which must be answered is whether or not the activity of the taxpayer in geographically expanding the area which is being mined at the particular site in Reynolds County constitutes an expansion of the existing mining plant." His answer is that a mere geographical extension of a mining operation, without an attendant increase in ore output, does not constitute an expan-

sion of the mining operation for purpose of the exemption in question. Appellant invokes the requirement that a tax exemption be construed strictly against the taxpayer and relies upon statements that the purpose of an exemption such as this is "to encourage the development of * * * enterprises to produce products in this state which are subject to sales tax when sold and thus build up the economy of this state." *West Lake Quarry & Material Co. v. Schaffner*, 451 S.W.2d 140, 142[1] (Mo.1970). Relying on this statement, appellant argues that the purpose of the exemption is not met if the operational change does not result in the production of material eventually subject to sales tax and therefore the exemption should not apply in such circumstances. Such, essentially, was the conclusion of the Director of Revenue in adopting the Hearing Examiner's report.

 Although the exemption is construed strictly against the taxpayer, that requirement should not nullify the legislative purpose in making the exemption available. As pointed out in *West Lake*, one object of the exemption is to stimulate the economy by encouraging the production of products which are subject to the sales tax. An equally important object of such exemption is the furtherance of industrial development in the state, regardless of whether the products involved might become subject to the Missouri sales tax. *Floyd Charcoal Co. v. Director of Revenue*, 599 S.W.2d 173, 177 (Mo.1980).

In the present case, had the nature of the ore body been known upon the inception of the mining operation and the machinery now involved been purchased at that time, there would be no question that the purchases would have been exempt as being "used to establish new * * * mining * * * plants * * *." However, the need for such machinery became apparent only after the original operation had begun and it had become apparent that the mineral deposits were so situated that enlargement of the area of operation would be required if the mining operation was to be economically feasible.

By Webster's Third International Dictionary (1961) expand means: "1: to spread out: * * * 2: to increase the extent, size, number, volume or scope of: ENLARGE * *." Here, the operation had to "spread out" in order to produce the same quantity of mineral. Note the finding of the Hearing Examiner that more versatile equipment was required "to *expand* the mine vertically and horizontally to continue its operation (emphasis supplied)." The mine was "enlarged" greatly. The volume of mineral was not increased but the volume of material required to be removed in order to produce the mineral did increase. Furthermore, the equipment provided means whereby the volume of mineral produced could be increased when conditions warranted.

In applying the law upon the uncontradicted facts, the circuit court properly concluded that the machinery and equipment here involved were purchased to "expand" an existing mining operation.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the judges concur.