**CONAGRA POULTRY CO., Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent.**

No. 75441.

Supreme Court of Missouri,
En Banc.

Sept. 28, 1993.

Rehearing Denied Oct. 26, 1993.

**916**

John P. Barrie, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Chief Justice.

Conagra Poultry Company filed a petition before the Administrative Hearing Commission (AHC) seeking a determination that Conagra was not liable for the sales tax, interest, and additions to tax that the Director assessed on Conagra's sales of wood shavings to its turkey-farming contractors. Conagra asserted that the sales were exempt as sales of fertilizer. § 144.030.2(1), RSMo 1986. The Commission determined that Conagra is liable for the sales tax, interest, and additions as assessed. Conagra appealed. The decision of the Commission is affirmed in part and reversed in part.

I

Conagra is in the business of processing turkeys. It contracts with independent farmers in Missouri to raise turkeys. Conagra owns the turkeys it provides to the growers to raise. Conagra pays the growers a cash price after the growers raise the turkeys.

In partial consideration of the farmers' growing the turkeys, Conagra purchases wood shavings from a supplier and has the shavings delivered to the growers. The growers use the wood shavings to line the floor of the structures in which the turkeys are housed. The shavings absorb turkey droppings, a practice essential to maintaining the health of the turkeys. Before absorbing turkey droppings, the wood shavings have no value as fertilizer.

After the wood shavings absorb a sufficient amount of droppings, the combination, "litter," is used to fertilize the growers' crops. The growers feed some of the crops on which they use the litter to their own livestock. Conagra selects its contractors, in part, on the basis of their ability to use all of the litter their turkey raising operation will produce. Use of litter is ecologically sound; once the wood shavings become saturated with the organic nutrients from the droppings, the shavings allow a gradual release of the nutrients into the soil, lessening the risk of violating water pollution laws.

From August 1, 1988, through March 31, 1989, Conagra paid $458,094.60 for wood shavings that were subsequently delivered to various turkey farmers. Conagra paid no sales tax on the transfer of these shavings to the growers. Conagra did not receive exemption certificates from its contract growers during 1988 and 1989. In 1991, Conagra prepared exemption certificates for each grower in anticipation of an audit by the Director of Revenue. In over ninety percent of the exemption certificates no ground was stated for the exemption. The remaining certificates stated as grounds for the exemption, "[a]cquisition of wood shavings pursuant to single 'litter' agreement; wood shavings are used to collect turkey droppings to produce fertilizer which is exempt from Missouri sales/use tax pursuant to 144.030.2(1) and

Missouri Sales Tax Rules 10–3.282." Conagra requested that each grower sign an exemption certificate. The Director of Revenue eventually assessed $29,089.02 sales tax, $9,897.06 interest, and a $1,454.46 penalty.

Conagra filed a petition with the AHC, appealing the Director's tax assessment. After a hearing, the AHC held that the transfers of wood shavings were not exempt from sales tax pursuant to the fertilizer exemption of § 144.030.2(1). The AHC refused to accept the exemption certificates as evidence of the tax-exempt use of the shavings, holding that the certificates were not received in good faith. The AHC further held that Conagra was liable for interest pursuant to § 144.170, RSMo 1986, and for a penalty pursuant to § 144.250, RSMo 1986.

## II

Conagra asserts that the AHC erred by not finding that the transfers of wood shavings qualify for the fertilizer exemption of § 144.030.2(1). Conagra contends that the items come within the term "fertilizer" as used in § 144.030.2(1) because, if an item is purchased as an ingredient or component of fertilizer and, in fact, is combined with other ingredients and used as fertilizer for exempt purposes, then the item should be exempt.

■ Conagra's position disregards the plain language of the statute at issue. Tax exemptions are to be strictly construed against the party claiming the exemption. *May Dep't Stores Co. v. Director of Revenue*, 791 S.W.2d 388, 389 (Mo. banc 1990). The primary rule of statutory construction requires courts to ascertain the intent of the legislature by considering the plain and ordinary meaning of the words used in the statute. *Jones v. Director of Revenue*, 832 S.W.2d 516, 517 (Mo. banc 1992). Section 144.030.2(1), RSMo 1986, exempts from sales tax "seed, limestone, or fertilizer which is to be used for seeding, liming, or fertilizing crops which when harvested will be sold at retail or will be fed to livestock or poultry to be sold ultimately in processed form at retail." The statute uses the term "fertilizer." The legislature's intention was to exempt "fertilizer" from sales tax if used for the proper purposes. Section 144.030.2(1) does not state that the component parts of fertilizer are also exempt from sales tax.

■ When the legislature intends to exempt from sales tax a component part or ingredient, it specifically so states. Section 144.030.2(2), enacted in the same legislative act as the current § 144.030.2(1), RSMo Supp.1992, specifically exempts:

(2) Materials, manufactured goods, machinery and parts which when used in manufacturing, ... become a *component part or ingredient* of the new personal property resulting from such manufacturing, ... and materials and manufactured goods which are ultimately consumed in the manufacturing process by becoming, in whole or in part, a *component part or ingredient* of steel products....

*See* Laws of Mo.1991, p. 509–13. (emphasis added). Section 144.030.2(1) includes no similar language. A legislative intent to exclude from sales tax exemption the component parts of fertilizer is thus clearly indicated by the legislature's failure to include within subsection 1 of § 144.030.2 the specific language, or similarly specific language, contained in subsection 2 of the same section enacted in the same act.

It has been suggested that, as a matter of policy, this Court should not penalize Conagra and its farmers for Conagra's method of contracting in hopes of benefiting from the fertilizer exemption, thereby allowing the farming industry to prosper. The suggestion ignores the fact that the legislature has enunciated its policy on the question in plain language. The legislature's having done so, this Court's sole obligation is to follow. This Court should not construe a legislative intent to allow a sales tax exemption for component parts of fertilizer without clear statutory language to that effect.

■ The AHC found that wood shavings have no independent value as fertilizer. Title to the wood shavings passed when Conagra completed delivery to the growers since the parties did not otherwise agree. § 400.2–401(2), RSMo 1986; *Kurtz Concrete, Inc. v. Spradling*, 560 S.W.2d 858, 861 (Mo. banc 1978). Since wood shavings have no independent value as fertilizer, and since

§ 144.030.2(1) does not exempt the component parts of fertilizer from sales tax, the sale of the wood chips is subject to taxation.

### III

Conagra contends that the AHC erred in failing to accept the exemption certificates from Conagra's contract turkey farmers because there was nothing in the record to suggest the certificates were incorrect or accepted in bad faith.

■ Conagra has the burden of proving that a sale is exempt from sales tax. §§ 144.210.1, 621.050.2, RSMo Supp.1992. When a vendor in good faith accepts an exemption certificate offered by a purchaser, the vendor is relieved of liability for sales or use tax for that transaction. § 32.200, art. V, subd. 2, RSMo 1986. Neither statute nor case law defines "good faith" in § 32.200. The phrase is generally understood, however, to convey the sense of "[h]onesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry." Black's Law Dictionary 193 (6th ed. 1990); see *Gammaitoni v. Director of Revenue,* 786 S.W.2d 126, 131 (Mo. banc 1990).

Exemption certificates, received and accepted in good faith, are essential to the functioning of Missouri's sales and use tax. The Director requires them to accomplish an efficient audit. Mo.Code Regs. tit. 12, § 10–3.538 (1993). Exemption certificates, received and accepted in good faith, protect sellers, who may know little or nothing about the facts upon which an exemption is claimed, from the obligation to investigate all buyers who may claim exemption because of their status or because of the intended use for purchases. Buyers, by signing the certificate, are alerted that they must be prepared to prove claims of exemption, because buyers are secondarily liable for the tax if the claim of exemption is improper. § 144.210.1, RSMo Supp.1992. The legislature, therefore, has balanced the interests of the state, the seller, and the buyer on the fulcrum of exemption certificates, received and accepted in good faith.

■ Appellate review of factual findings of the AHC is to determine whether the findings are supported by substantial evidence upon the record as a whole. *Gammaitoni,* 786 S.W.2d at 128. The AHC found that Conagra did not receive and accept the exemption certificates in good faith. The AHC's finding is supported by the record. Conagra was well aware of the facts underlying the transactions from the outset. *Cf. Gammaitoni,* 786 S.W.2d at 131. Conagra included the sale of the wood shavings as part of its agreement with the growers. As one criterion in selecting growers with whom to contract, Conagra looked to growers having sufficient acreage to be able to use all of the litter produced. Conagra, rather than the growers, prepared the exemption certificates. The growers signed the certificates at the request of Conagra. Conagra cannot in good faith claim that it refrained from collecting the tax based upon exemption certificates it prepared two years after the transactions, particularly under the circumstances set forth. Conagra is not a vendor or seller that in good faith accepted an exemption certificate as contemplated by § 32.200, art. V, subd. 2, RSMo 1986.

### IV

Conagra also assigns error to the AHC's conclusion that the Director's assessment of penalties pursuant to § 144.250.2, RSMo 1986, should be affirmed.

■ Section 144.250.2 provides that if a taxpayer fails to pay sales tax on or before the due date, the Director shall assess a penalty against the taxpayer unless "it is shown that such failure is due to reasonable cause and not the result of willful neglect, evasion or fraudulent intent." Taxing statutes that impose penalties are to be strictly construed against the taxing authority and in favor of the taxpayer. *Travelhost of Ozark Mountain Country v. Director of Revenue,* 785 S.W.2d 541, 546 (Mo. banc 1990). In *Hewitt Well Drilling v. Director of Revenue,* 847 S.W.2d 795, 799 (Mo. banc 1993),[1] this

---

1. In *Hewitt* this Court interpreted the language of § 144.665.1, RSMo 1986, which employes the same "reasonable cause"—"willful neglect" language as § 144.250.2. *Hewitt's* interpretation is

Court held that the taxpayer must show the absence of willful neglect, rather than reasonable excuse, in failing to file sales tax returns to avoid imposition of tax penalties. A taxpayer meets its burden if the taxpayer can show that it had a "good faith belief" that no tax was due. *Id.* Whether there is a good faith belief that no tax is due must necessarily be determined on a case by case basis.

*Hewitt* had not been handed down at the time of the decision of the AHC in this case. The AHC decided the issue of additions to tax by applying a reasonable cause standard, based upon reasonable and prudent business practices under the circumstances. The AHC found that Conagra did nothing "to ascertain the tax consequences of its business arrangements" and determined that the Director's assessment of penalties should stand. The AHC made no findings regarding penalties except for the phrase just quoted.

*Hewitt,* however, significantly reduces the taxpayer's burden. In *Hewitt* the president of the company testified that he was not aware that the consumer use tax existed and that he did not believe that any tax was due on the purchase of a well-drilling rig. From his longtime association with other companies in the industry, he additionally testified, he knew of no other well-drilling companies that paid consumer use tax on out-of-state purchases of rigs. This Court found that Hewitt met its burden to show that it was not willfully negligent in failing to pay taxes owing on the well-drilling rig and ordered the penalties set aside.

■ As evidence of its good faith belief that no tax was due,[2] Conagra points to the fact that it paid sales tax on purchases of wood shavings that did not ultimately become incorporated into litter that was used as fertilizer for exempt purposes, and to the testimony in the record that its treatment of the wood shavings in this instance was consistent with its treatment of wood shavings in other states. Applying the significantly less-

er burden on the taxpayer established by *Hewitt,* Conagra has met its burden to show that it was not willfully negligent in failing to pay sales taxes on the wood shavings. The penalties should be set aside.

V

The decision of the AHC is affirmed with respect to liability for sales tax and interest; the decision of the AHC is reversed with respect to additions on tax.

BENTON, LIMBAUGH and ROBERTSON, JJ., concur.

THOMAS, J., dissents in separate opinion filed.

PRICE, J., dissents in separate opinion filed.

HOLSTEIN and THOMAS, JJ., concur in opinion of PRICE, J.

THOMAS, Judge, dissenting.

I dissent, and I also concur in the dissenting opinion of Judge Price. Conagra retains title to the turkeys throughout the time the turkeys are being raised. Under the rationale employed by the majority, if Conagra were to retain title to the wood shavings until the turkeys have deposited the droppings on the shavings and only then transfer title to the "fertilizer" to the growers, then the transfer would be exempt under section 144.-030.2(1). Moreover, this result probably requires nothing more than a carefully drawn agreement between Conagra and the growers as to when title passes.

I do not think it is wise economic or tax policy to condition taxation upon such an insubstantial distinction. In my view, throughout the whole process—from the purchase of the wood shavings by Conagra, to their transfer to the growers, to the time the growers place the wood shavings and droppings on their fields—everyone involved has a bona fide intention to use the wood shav-

directly applicable to the interpretation of § 144.250.2.

2. In Part III above, the issue is whether the exemption certificates were received and accepted in good faith, thus relieving the seller of

liability for tax. In Part IV, the issue is broader, whether the seller had a good faith (albeit erroneous) belief that it was not subject to tax, based upon *all* the facts and circumstances of the case.

ings as fertilizer, and they do so. It is either fertilizer or something so close to it that it should be treated as fertilizer. Any other conclusion is a distinction without a difference. I would allow the exemption.

PRICE, Judge, dissenting.

I dissent from the majority opinion.

The Administrative Hearing Commission's (AHC) interpretation of revenue laws is reviewed *de novo* by this Court. The decision will be affirmed "if supported by the law and competent and substantial evidence on the whole record and ... not clearly contrary to the reasonable expectations of the General Assembly." *L & R Egg Co. v. Director of Revenue*, 796 S.W.2d 624, 625 (Mo. banc 1990). Here, the AHC decision, and the majority opinion, misses on all counts.

*Section 144.030.2(1)* exempts from sales tax:

> ... seed, limestone or fertilizer which is to be used for seeding, liming or fertilizing crops which when harvested will be sold at retail or will be fed to livestock or poultry to be sold ultimately in processed form at retail....

The primary rule of statutory construction is to give words their plain and ordinary meaning. *State ex rel. Union Elec. Co. v. Goldberg*, 578 S.W.2d 921, 923 (Mo. banc 1979). This Court, however, should not construe a statute so as to reach a result not intended by the legislature. *L & R Egg Co.*, 796 S.W.2d at 625.

The parties differ in their interpretation of the word "fertilizer". Conagra maintains that if an item is purchased as an ingredient of fertilizer and, in fact, is combined with other ingredients and used as fertilizer for exempt purposes, then the item should be exempt. The Director contends that because the shavings had no independent value as fertilizer at the time of transfer and must be combined with the turkey droppings for value as fertilizer, the exemption does not apply.

Unfortunately, the majority adopts the position of the AHC based upon this analysis of § 144.030(2), a subsection not at issue here. *Section* 144.030(2) provides an exemption for component parts used in the manufacturing of "new personal property." A brief review of this section shows that it speaks to an entirely different situation, the manufacturing of personal property, than does § 144.-030(1), the pertinent part of which concerns itself with agricultural activity. Whether the wood shavings would or would not be exempted from tax pursuant to § 144.030(2) simply has nothing to do with whether they are exempted under § 144.030(1). By focusing on the language of the wrong statute, the majority almost wholly ignores the controlling language and reaches a result out of context with the law, facts, and policy that should be the core of this case.

*Section* 144.030(1) exempts "fertilizer which is to be used for ... fertilizing crops." There is no distinction in the statute as to whether the fertilizer is whole or part, mixed or unmixed, completed or uncompleted at the time of transfer. Instead, the "modifier" is one of a functional nature which eliminates the need for such esoteric analysis. It focuses on use.

Here, there is no doubt that the wood shavings were intended to be used and were used as fertilizer. The record reveals that the shavings enhanced the value of the droppings as fertilizer and that the combined droppings and shavings were actually used by the growers as fertilizer. The record also indicates that wood shavings were the chosen medium because of their ability to release the nutrients from the droppings slowly into the soil. This avoided nitrogen burning, ecological damage from runoff and provided for a release of the nutrients into the soil over time as needed.[1] Significantly, Conagra selected its turkey growers partly on the basis of their ability to use all the litter on their fields as fertilizer.

---

1. It is not at all unusual for farmers to buy chemicals which, if applied directly to crops, would be absolutely useless and may even damage the crop. These chemicals must be mixed with other ingredients or inert carriers to be of any real use. Under the majority's analysis, such chemicals, because they must be combined with other ingredients, are not fertilizer but component parts of fertilizer and are not entitled to the exemption. The folly of this result exhibits the need for focus on the use of the item as fertilizer, not the process of preparing it for use.

Conagra may well have designed its method of contracting in hopes of enjoying this particular tax benefit. There is no reason to penalize Conagra or its growers for doing so. As long as such programs are grounded in fact and reasonable business purposes, it is in the state's interest to foster a climate that encourages both in-state and out-of-state businesses to contract with Missouri farmers and to develop business relationships within the state. This has long been recognized as one of the legislative goals of § *144.030*. In *State ex rel. Ozark Lead Co. v. Goldberg,* 610 S.W.2d 954, 957 (Mo.1981), it was said:

> Although the exemption is construed strictly against the taxpayer, that requirement should not nullify the legislative purpose in making the exemption available. As pointed out in *West Lake [Quarry & Material Co. v. Schaffner,* 451 S.W.2d 140 (Mo.1970) ], one object of the exemption is to stimulate the economy by encouraging the production of products which are subject to the sales tax. An equally important object of such exemption is the furtherance of industrial development in the state, regardless of whether the products involved might become subject to the Missouri sales tax. *Floyd Charcoal Co. v. Director of Revenue,* 599 S.W.2d 173, 177 (Mo.1980).

To tax the transfer of wood shavings for use as an ingredient of fertilizer is inconsistent not only with the language of § 144.-030(1) and the facts at issue, but also with this statutory purpose. It is unlikely the legislature intended to penalize farmers for procuring essential fertilizer ingredients separately as opposed to premixed fertilizers. It is also inconsistent with the purpose of this statute to hinder the type of carefully constructed commercial relationships that will allow our farmers to prosper in a complex and competitive world.