**ALL STAR AMUSEMENT,
INC., Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent.**

No. 076539.

Supreme Court of Missouri,
En Banc.

April 26, 1994.

Thomas E. Carew, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gretchen Garrison, Asst. Atty. Gen., Jefferson City, for respondent.

COVINGTON, Chief Justice.

All Star Amusement, Inc., appellant, sells cigarettes, food, and beverages in the Kansas City metropolitan area. The Director of Revenue audited All Star and assessed sales and use tax, interest, and additions. All Star appealed the assessment to the Administrative Hearing Commission (AHC). At the hearing, All Star presented several signed exemption certificates that were undated or dated after alleged exempt sales had occurred. The AHC held, as a matter of law, that All Star had not received the exemption certificates in good faith; therefore, it was not shielded from sales tax liability under § 32.200, art. V, § 2, RSMo 1986. The Missouri Court of Appeals, Western District, transferred the case because this Court has exclusive appellate jurisdiction in cases involving construction of Missouri's revenue laws. Mo. Const. art. V, §§ 3 and 11. Reversed and remanded.

The facts recited are those relevant to the issue that invokes this Court's original appellate jurisdiction. All Star Amusement, Inc., was incorporated in Missouri in 1981. It does business as Kansas City Automated Food Service in the Kansas City metropolitan area. All Star owns and derives receipts from coin-operated cigarette, snack, and soda vending machines. All Star purchased goods suitable for vending in large quantities at favorable prices. It sold some of the goods at retail in its vending machines and sold the remainder at retail and wholesale directly to various buyers. All Star filed no sales tax returns until June 1987.

The Director of Revenue conducted a sales and use tax audit for the period January 1, 1985, through December 31, 1989. The director commenced the audit in August 1987, but discontinued it because of inadequate records and insufficient cooperation. The director recommenced the audit in November 1989, and concluded it in November 1990. As a consequence of inadequate record keeping, the director approximated gross receipts

based upon available evidence. The director assessed sales and use tax, interest, and additions. All Star appealed the director's tax assessment to the AHC.

At the administrative hearing, All Star produced signed exemption certificates and exemption letters from several of its purchasers. Some of the exemption certificates were not dated and some were dated after alleged exempt sales had occurred. The AHC held, as a matter of law, that the phrase "good faith" in § 32.200, art. V, § 2, requires sellers to receive exemption certificates contemporaneously with the sale, and that exemption certificates be dated. Accordingly, the AHC refused to find exempt any sales made to buyers that had given undated exemption certificates. For the dated exemption certificates, the AHC found exempt only those sales that occurred in the month a certificate was dated and those that occurred thereafter.

On appeal from the AHC, All Star raises three points, the second of which is dispositive for purposes of this Court's original appellate jurisdiction: the AHC misinterprets the good faith requirement of § 32.200.

■ The dispositive issue is a question of law, not fact. In *Gammaitoni v. Director of Revenue*, 786 S.W.2d 126 (Mo. banc 1990), and *Conagra Poultry Co. v. Director of Revenue*, 862 S.W.2d 915 (Mo. banc 1993), this Court addressed the good faith requirement of § 32.200. In both cases we affirmed the AHC's holding that the appellant's sales were not exempt. This Court then addressed the issue of whether the appellants were nonetheless shielded from sales tax lia-

bility under § 32.200 by reason of having received exemption certificates in good faith. In both, we upheld the AHC's factual finding that the appellants had not accepted the exemption certificates in good faith because the findings were supported by substantial evidence upon the record as a whole. Unlike the factual determinations under review in *Gammaitoni* and *Conagra*, the Commission's conclusion of law is at issue here. This Court will exercise its independent judgment in correcting errors of law. *Sneary v. Director of Revenue*, 865 S.W.2d 342, 344 (Mo. banc 1993).

Under Missouri's sales tax statute, sellers must collect and remit sales tax on all sales of tangible personal property unless the transaction or purchaser is exempt. §§ 144.-020, 144.030, 144.080, RSMo 1986 & RSMo Supp.1993. Section 32.200, art. V, § 2, RSMo 1986, part of the Multistate Tax Compact adopted by Missouri, offers sellers a safe harbor that provides absolute relief from sales tax liability irrespective of whether the underlying transaction qualified for an exemption. It states:

> Whenever a vendor receives and accepts in *good faith* from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

*Id.* (emphasis added).[1]

In *Conagra*, this Court stated that the phrase "good faith" is generally understood

1. The separate opinion would hold that § 32.200, art. V, § 2, does not apply to the case *sub judice* because an interstate tax conflict does not exist to trigger its application. The separate opinion raises the issue, argues it, and decides it. Neither party raised, argued, or briefed the issue to the AHC or to this Court. The AHC did not address the issue in its decision.

The appellate process best serves its purpose when it resolves legal disputes after the parties have presented opposing arguments. Relevant considerations on both sides of an issue, considerations that may otherwise be overlooked, are best raised by adversarial arguments of parties whose interests are at stake. This is especially true where the issue involved is complex. For example, the Court notes that strong arguments

can be made against the view expressed in the separate opinion. Section 32.200, art. V, § 2, is a Missouri statute. It was adopted by the Missouri legislature under procedures set forth in the Missouri Constitution. The section carries the same weight as any other constitutionally enacted statute. The section is unambiguous. Neither § 32.200, art. V, § 2, nor the "Purposes" section in § 32.200, art. I, states that the safe harbor applies only where an interstate tax dispute occurs. Courts need not look to history to divine a statute's purpose or intention where a clear statutory mandate exists, nor should a statutory purpose act to override clear statutory language. Finally, this Court has twice stated that § 32.200, art. V, § 2, has legal effect in cases where no interstate tax dispute existed. *See Con-*

to "convey the sense of '[h]onesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry.'" *Conagra,* 862 S.W.2d at 918 (citing Black's Law Dictionary 193 (6th ed. 1990)). Consistent with the definition set forth in *Conagra,* good faith receipt of an exemption certificate requires that a seller honestly believe that the buyer is exempt from paying the sales tax. Good faith belief may rest solely upon the representations made by the buyer in the exemption certificate,[2] as such reliance fulfills the function of exemption certificates. *See Conagra,* 862 S.W.2d at 918 ("Exemption certificates, received and accepted in good faith, protect sellers, who may know little or nothing about the facts upon which an exemption is claimed, from the obligation to investigate all buyers who may claim exemption because of their status or because of the intended use for purchases."). If a seller possesses information or has knowledge that should raise doubts regarding the buyer's claimed exemption, however, or suspects the genuineness of an exemption certificate, the seller must investigate to the point that it is honestly convinced that the buyer or the transaction is exempt.

■ Under the reasoning of *Conagra,* and contrary to the holding of the AHC, there is no absolute requirement, as a matter of law, that a seller receive an exemption certificate contemporaneously with a sale or that the certificate be dated so as to fulfill the good faith component of § 32.200.[3] A seller may, in certain circumstances, receive an exemption certificate in the good faith belief that the buyer is exempt from the sales tax where the certificate is not received contemporaneously with the sale or where the certificate is not dated. A post-transaction exemption certificate or one that is not dated may, however, influence a factual finding on the issue of a seller's good faith.

The decision is reversed and the case is remanded to the AHC for factual determinations on whether All Star accepted the exemption certificates in good faith. Even if the AHC finds that All Star accepted some of

---

agra Poultry Co. v. Director of Revenue, 862 S.W.2d 915 (Mo. banc 1993); Gammaitoni v. Director of Revenue, 786 S.W.2d 126, 131 (Mo. banc 1990). Gammaitoni was decided over four years ago. During that time taxpayers have relied on the safe harbor and the legislature has chosen not to override the holding with contrary legislation.

This Court in its discretion declines to assume the roles and respective responsibilities of the parties to raise the issue and develop arguments. Although we could require that the parties submit briefs on the issue and reargue before this Court, we see no benefit in such action because even the Department of Revenue, the party more likely to dispute application of § 32.200, takes the position that § 32.200, art. V, § 2, has application in cases such as this one. This Court will address the controversy when it is properly brought before the Court. Perhaps a future litigant will advance the issue raised by the separate opinion. At that time, after full briefing and argument by the parties, this Court will be better situated to decide the issue.

2. Resale exemption certificates contain the following representations:

I certify that [name and address of purchaser] is registered with the below listed states and cities within which your firm would deliver purchases to us and that any such purchases are for wholesale, resale, ingredients or components of a new product to be resold, leased, or rented in the normal course of our business.

We are in the business of wholesaling, retailing, manufacturing, leasing, or renting.

. . . .

I further certify that if any property so purchased tax free is used or consumed by the firm as to make it subject to a Sales or Use Tax we will pay the tax due direct to the proper taxing authority when state law so provides or inform the seller for added tax billing. This certificate shall be part of each order which we may hereafter give to you, unless otherwise specified, and shall be valid until cancelled by us in writing or revoked by the city or state.

3. The AHC held that good faith under § 32.200 requires exemption certificates to be "regular on their face," meaning, *inter alia,* that the certificate must be dated. The AHC appears to have reached this conclusion relying on Judge Blackmar's dissenting opinion in *Van Cleave Printing Co. v. Director of Revenue,* 784 S.W.2d 794, 796 (Mo. banc 1990) (Blackmar, J., dissenting) ("If the seller possesses exemption certificates which are regular on their face, then challenges to the exemption must be made against the buyer."), and § 144.210, RSMo 1986, which contains an independent provision that requires buyers to sign exemption certificates.

Section 144.210 does not require exemption certificates to be dated. As for Judge Blackmar's dissent in *Van Cleave,* even if authoritative, it should not be read to mean that an exemption certificate that is "irregular on its face" automatically evidences a lack of good faith.

the disputed exemption certificates in good faith, All Star must still demonstrate which sales were made to the exempt companies. All Star may find this burden difficult as a consequence of its inadequate record keeping, which required the director to approximate gross receipts.

The issue that vested jurisdiction in this Court having been resolved, appellant's remaining points on appeal may properly be presented to the court of appeals after the commission makes its factual determinations on remand.

The decision is reversed and the cause remanded.

HOLSTEIN, THOMAS, PRICE, LIMBAUGH and ROBERTSON, JJ., concur.

JOSEPH M. ELLIS, Special Judge, concurs in part and dissents in part in separate opinion filed.

BENTON, J., not sitting.

JOSEPH M. ELLIS, Special Judge, concurring in part and dissenting in part.

I concur with the majority that the AHC erred, as a matter of law, in holding that an exemption certificate is void unless it is dated and received contemporaneously with the sale. However, I must respectfully dissent insofar as the opinion gives § 32.200, RSMo 1986, the Multistate Tax Compact as adopted in Missouri, the effect of substantive tax law.

In *Goldberg v. State Tax Comm'n,* 639 S.W.2d 796, 799 (Mo. banc 1982), this Court declared:

> The Compact was never intended by anyone to be a substantive taxation statute.... It was conceived as merely a procedural vehicle by which the states could resolve conflicts among themselves and aggrieved taxpayers concerning the proper scope of taxation authority that affected states could exercise with regard to a taxpayer subject to taxation in more than one state.

The Court then went on to say:

> The purpose clauses of Article I and the arbitration provisions of Article IX confirm

this interpretation.... The drafters of the Compact and those states that adopted it never intended for it to have a substantive effect on taxation. That was not its purpose.

*Id.* at 800.

The foregoing language was subsequently approved by this Court in *Brown Group, Inc. v. Administrative Hearing Comm'n,* 649 S.W.2d 874, 880 (Mo. banc 1983), and *King v. Procter & Gamble Distrib. Co.,* 671 S.W.2d 784, 785 (Mo. banc 1984). In 1990, this Court again confirmed the continued vitality of its holding in *Goldberg.* In *Williams Companies v. Director of Revenue,* 799 S.W.2d 602, 606 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991), the Court held that "the Compact was not intended to authorize an alternative tax base" from that specified in § 143.431, RSMo 1986. Rejecting the appellants' argument to the contrary, the Court stated:

> However, in *Goldberg v. State Tax Commission,* 639 S.W.2d 796, 799 (Mo.1982), this Court stated that the Multistate Tax Compact "was never intended by anyone to be a substantive taxation statute ... [but] was conceived as merely a procedural vehicle by which the states could resolve conflicts among themselves and aggrieved taxpayers."

*Id.* at 605–06.

*Williams Companies* was handed down on November 20, 1990. Some eight months earlier, but well after *Goldberg, Brown Group* and *King* were handed down, this Court issued its opinion in *Gammaitoni v. Director of Revenue,* 786 S.W.2d 126 (Mo. banc 1990). In *Gammaitoni,* there was no dispute between Missouri and another state or otherwise involving an aggrieved multistate taxpayer so as to invoke the Multistate Tax Compact. Nevertheless, without mentioning, discussing, or distinguishing *Goldberg* or its progeny, this Court said:

> Appellant bears the burden of proof that sales of tangible personal property are not sales at retail and thereby exempt from tax. §§ 621.050, 144.210, *32.200,* RSMo 1986. When a vendor in good faith accepts an exemption certificate offered by a pur-

chaser, the vendor is relieved of liability for sales or use tax for that transaction. § 32.200, RSMo; Mo. Const. art. V, § 2 [sic].[1]

*Gammaitoni,* 786 S.W.2d at 131 (emphasis and footnote added).

The Court also treated the Compact as substantive Missouri tax law in *Conagra Poultry Co. v. Director of Revenue,* 862 S.W.2d 915 (Mo. banc 1993). Like *Gammaitoni, Conagra* did not involve an interstate tax dispute or an aggrieved multistate taxpayer. Without discussing, analyzing, or even mentioning *Goldberg, Brown Group, King,* or *Williams Companies,* this Court nevertheless declared that a vendor who accepts an exemption certificate "in good faith" from a purchaser is relieved of liability for sales or use tax for that transaction, citing only art. V, § 2 of the Compact as authority for that proposition. *Conagra,* 862 S.W.2d at 918.

The majority now relies on *Gammaitoni, Conagra,* and § 32.200, art. V, § 2 to support its twin holdings that (a) "sellers [have] a safe harbor that provides absolute relief from sales tax liability irrespective of whether the underlying transaction qualified for an exemption" and (b) an exemption certificate must be received and accepted in "good faith" to qualify for this safe harbor. Maj. op. at 844.

The majority is clearly applying art. V, § 2 of the Multistate Tax Compact as adopted in Missouri as *substantive taxation law.* In so doing, it ignores this Court's decisions in *Goldberg* and its progeny and compounds a mistake first made in *Gammaitoni* and perpetuated in *Conagra.* The majority asserts this opinion raises, argues and decides an issue not raised, briefed or argued by the parties. Maj. op. at 844 n. 1. To the contrary, this opinion raises no new issue, but seeks merely to apply the correct law to the case before the Court. The issue presented by the parties is whether the AHC erred in holding that All Star was not entitled to credit for certain transactions because the exemption certificates All Star had for such transactions were not received in good faith. This opinion addresses that precise issue by pointing out that the AHC has misinterpreted the applicable law because the good faith requirement contained in § 32.200, art. V, § 2 is not applicable to this case.

As indicated in *Goldberg,* the Multistate Tax Compact was never intended to be, nor is it, substantive taxation law but merely a procedure to permit states to resolve disputes between and among two or more states and an aggrieved taxpayer.

In *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), the United States Supreme Court held that net income from the interstate operations of a foreign corporation can be subjected to state taxation if it is nondiscriminatory and fairly apportioned to activities in the locale that have an adequate nexus to permit exercise of the taxing power. A short time later, the Supreme Court refused to review a state court decision upholding such taxation where the only activity of the business was limited to solicitation of orders. *International Shoe Co. v. Fontenot,* 107 So.2d 640 (La.1958), *cert. denied,* 359 U.S. 984, 79 S.Ct. 943, 3 L.Ed.2d 933 (1959).

As a result of these decisions, the business community was alarmed, fearing taxation by states where a business had no property or employees, and the potential requirement to file tax returns in numerous states, even if activities and income were minimal. There was soon pressure on Congress to limit state jurisdiction to tax multistate businesses. This led to passage of Pub.L. No. 86–272, 73 Stat. 555 (1959) (*codified at* 15 U.S.C. § 381 (1988)). In essence, the law prohibits states from taxing business income when the company's only activity within the state is soliciting orders or using independent contractors to make sales. In addition, however, the statute called for Congress to study and report on multistate income taxation. Two years later, Congress enacted Pub.L. No. 87–17, 75 Stat. 41 (1961), which expanded the study to include sales taxes.

---

**1.** The Court was clearly referring to art. V, § 2 of the *Multistate Tax Compact,* not art. V, § 2 of the Missouri Constitution.

The study committee, designated the "Special Subcommittee on State Taxation of Interstate Commerce," but also referred to as the Willis Subcommittee, completed its report in 1965. It recommended, among other things, that all states be required to use a federal income tax base and a two factor apportionment formula for income taxation, as well as a uniform sales and use tax law. Legislation was introduced to adopt these recommendations, and hearings were held over a four month period in early 1966. Officials from 46 states testified at the hearings, generally all in opposition, contending the bill would reduce their tax revenue, hamper administration of state tax laws, and bring about changes in business organization designed to avoid taxation. As a result of the opposition, a substitute bill was introduced retaining most of the original proposal's features but eliminating federal administration. It failed to pass in 1966 and a similar bill was introduced in 1967.

The introduction of the federal legislation caused state officials to take aggressive action. The National Legislative Conference, under the auspices of The Council of State Governments, the National Association of Tax Administrators and the National Association of Attorneys General drafted the Multistate Tax Compact between February and December, 1966. It required adoption by seven states to go into effect. This was quickly achieved and the Compact became effective on August 4, 1967. The last federal proposal on the subject died on October 14, 1968, when the 90th Congress adjourned. *See generally Goldberg*, 639 S.W.2d at 799–800; All State Tax Guide (P–H) ¶ 551 (1981); 1 State Tax Guide (2d ed.) (CCH) ¶ 351 (1993); *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 454–57, 98 S.Ct. 799, 803–04, 54 L.Ed.2d 682 (1978).

From the foregoing, it is obvious the Compact was created to prevent, or at the very least eliminate the impetus for, federal intervention in state taxation of interstate businesses. The same historical background demonstrates that the Compact was intended to be a procedural device rather than substantive taxation law for the adopting states. Indeed, the drafters themselves so declared:

> [T]he basic justification for the Multistate Tax Compact is that the States themselves are the most appropriate instruments for the determination of their own tax laws and policies. *The Compact is a means by which the States can cooperatively work out any problems which may exist, or which may arise in the future, because businesses function in more than one State.*

*Goldberg*, 639 S.W.2d at 799 (*quoting* Multistate Tax Commission, Suggested State Legislation and Enabling Act, at C–3 to C–4) (emphasis added). The purposes section of the Compact further evidences its procedural nature:

> The purposes of this compact are to:
> 1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.
> 2. Promote uniformity or compatibility in significant components of tax systems.
> 3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.
> 4. Avoid duplicative taxation.

§ 32.200, art. I.

A review of the Compact itself demonstrates that it does not prescribe uniform standards but, rather, provides "the procedure and machinery for interstate cooperation in the formulation of such standards." All State Tax Guide (P–H) ¶ 559 (1981). Section 32.200, art. VII, § 1 provides that when two or more party states, or subdivisions thereof, have similar or uniform provisions of law "relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the [Multistate Tax] [C]ommission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms."

Finally, and perhaps most conclusively, there are two other states that have addressed the question of whether the Compact is substantive tax law or merely a procedural device for resolving multistate tax disputes. In *Land O'Frost, Inc. v. Pledger*, 308 Ark.

208, 823 S.W.2d 887, 889–90 (1992), the Arkansas Supreme Court, rejecting a claim that the Compact superseded a revenue department regulation prohibiting the filing of corporate tax returns employing a unitary tax basis, held the Compact was not a substantive taxation statute but a procedural vehicle to resolve disputes among states and aggrieved taxpayers. Similarly, the Alabama Court of Civil Appeals acknowledged the procedural nature of the Compact in *Burton Mfg. Co. v. State,* 469 So.2d 620 (Ala.Civ.App. 1985). Both Arkansas and Alabama are party states to the Compact.

*Goldberg* involved an income taxation issue. Therefore, it may be argued that the holding applied only to the income tax portions of the Compact. In other words, the income tax portions are procedural, but the other parts of the Compact, particularly Article V dealing with sales and use taxation, are substantive.

The evidence is overwhelming that such is not the case. The Multistate Tax Commission adopted regulations for income, sales and use taxes and arbitration on November 19, 1968. All State Tax Guide (P–H) ¶ 559 (1981). The sales and use tax regulations require collection and payment by vendors who directly or by an agent (1) maintain an office or place of business, (2) maintain inventory, (3) seek orders, (4) provide regular delivery other than by mail or similar carrier, or (5) engage in any activity relating to leasing or servicing instate property. Multistate Tax Commission Regulation V (Sales and Use Tax Jurisdiction Standard), *reprinted in* All State Tax Guide (P–H) ¶ 680 (1981). The Compact itself also provides a credit to a buyer liable for use tax on tangible personal property for the combined amount of sales or use taxes paid to another state or political subdivision. § 32.200, art. V, § 1. And, a vendor who receives or accepts in good faith a resale or other exemption certificate from a purchaser is relieved of liability for sales or use tax on the transaction. § 32.200, art. V, § 2. Finally, the Multistate Tax Commission has created a uniform sales and use tax exemption certificate, which has been deemed acceptable in most party states, including Missouri, and is designed to allow compliance "with the majority of state and local tax law requirements." 1 State Tax Guide (2d ed.) (CCH) ¶ 395 (1993).

Also in the sales and use tax area, adoption of the Compact and promulgation of regulations by the Commission has inspired some party states to enter into reciprocal sales and use tax collection pacts. Typically, the agreements are between neighboring states and generally provide that each state will require collection and payment of the other state's sales-use tax. Missouri has entered into such agreements with Kansas, Nebraska and Oklahoma. *See* All State Tax Guide (P–H) ¶ 558 (1981). In addition, Missouri is a party to the Midwestern States Bilateral Tax Enforcement Agreement, a mutual voluntary tax compliance agreement designed to increase compliance with each state's sales and use tax laws, which also includes Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Nebraska and South Dakota. 2 State Tax Guide (2d ed.) (CCH) ¶ 60–000, at 6012 (1993).

Finally, the types of sales and use tax disputes the Compact was designed to provide a procedure for resolving are illustrated by several cases from foreign jurisdictions. In *Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303 (Utah 1992), the taxpayer operated a facility in Utah where it designed and fabricated large steel storage tanks. It purchased the steel plates used in fabrication from Utah vendors. Some tanks, because of their size, were shipped in parts to a customer's location for assembly. Some of the tanks were shipped to and assembled in California. The taxpayer did not pay sales tax on the steel plates it purchased in Utah. When it installed the tanks, it billed its customers for the sales or use taxes imposed by the state in which the tanks were installed and remitted those taxes to that state. The Utah State Tax Commission assessed taxes on the purchases made from Utah vendors. Chicago Bridge & Iron appealed, arguing, among other things, that because California may impose a use tax when the tanks are installed there, it could be subjected to double taxation, relying on a 1941 decision of the California Supreme Court holding that steel purchased outside California for use in fabrication of tanks in California was subject to California use tax. The Utah Supreme Court rejected this contention, finding that both Utah and California had adopted the

Compact and that art. V, § 1 provided the procedure for resolving any such dispute because it would require California to give credit against its use tax for any Utah sales tax levied. In *Niederhauser Ornamental & Metal Works Co. v. Tax Comm'n, Auditing Div.,* 858 P.2d 1034 (Utah Ct.App.1993), the court relied on *Chicago Bridge & Iron* and reached the same result in a case involving sales tax paid to Nevada.

In *State v. Obexer & Son, Inc.,* 99 Nev. 233, 660 P.2d 981 (1983), the taxpayer was a boat dealer with its sole place of business in California. Obexer collected and remitted to the Nevada department of taxation sales tax on purchases made by Nevada residents when the purchasers took delivery at Obexer's place of business in California. Obexer did not collect and pay California sales tax on those transactions. California audited Obexer and assessed a deficiency against it for those sales, which Obexer paid. It then petitioned the Nevada department of taxation for a refund. The petition was denied. Obexer filed suit for a refund, and the trial court ruled in its favor. On appeal, the Nevada Supreme Court held that Obexer was entitled to a refund for the taxes paid after both Nevada and California adopted the Compact because art. V, § 1 enables purchasers to credit the sales or use taxes paid in one state against the use taxes due in another. *See also State v. Sinclair Pipeline Co.,* 605 P.2d 377 (Wyo.1980).

The conclusion is inescapable that the Multistate Tax Compact, in its entirety, is "merely a procedural vehicle by which ... states [can] resolve conflicts among themselves and aggrieved taxpayers concerning the proper scope of taxation authority that affected states [can] exercise with regard to a taxpayer subject to taxation in more than one state." *Goldberg,* 639 S.W.2d at 799. "The Compact was never intended by anyone to be a substantive taxation statute." *Id.* The

majority's reliance on § 32.200, art. V, § 2 to hold that an exemption certificate must be received "in good faith" and, if so received and accepted, provides a vendor with absolute protection from liability for payment of sales tax, gives art. V, § 2 of the Compact the effect of substantive Missouri tax law. In so doing, the majority's holding is contrary to the clear intent of the drafters of the Compact and the legislature, as well as the Court's own prior cases.

The majority's decision disregards § 144.210.1, RSMo Supp.1991, which is the only substantive taxation statute relating to exemption certificates for sales tax purposes currently in effect in Missouri. It merely requires that a "seller shall obtain and maintain exemption certificates signed by the purchaser or his agent as evidence for any exempt sales claimed...." The statute says nothing about receiving and accepting exemption certificates "in good faith." In addition, § 144.210.1 also provides, in pertinent part (emphasis added):

> [W]hen a purchaser has purchased tangible personal property or services sales tax free under a claim of exemption which is found to be improper, the director of revenue may collect the proper amount of tax, interest, additions to tax and penalty *from the purchaser directly.* Any tax, interest, additions to tax or penalty collected by the director from the purchaser shall be credited against the amount *otherwise due from the seller* on the purchases or sales where the exemption was claimed.

Thus, our substantive statute on sales tax exemptions certificates provides no "safe harbor" to vendors where a claim of exemption is later found to be improper.[2] Rather, it provides only that the director *"may "* collect amounts due directly from the purchaser, and if she does, the amounts so collected are to be credited to the account of the seller, who would "otherwise" be responsible for the

---

**2.** Section 144.270, RSMo 1986, provides:

> For the purpose of more efficiently securing the payment of and accounting for the tax imposed by sections 144.010 to 144.510, the director of revenue shall make, promulgate and enforce reasonable rules and regulations for the administration and enforcement of the provisions of sections 144.010 to 144.510.

Citing this section as authority, the director has promulgated several rules relating to the subject of sales tax exemption certificates, and pertinent to the issues under discussion. The relevant provisions of 12 CSR 10–3.192 are:

> (2) When the Department of Revenue has reason to believe the seller *acted not in good faith in the acceptance of an exemption certificate,* the department is empowered to make an addi-

amounts due. It evidences the General Assembly's intention to give the director utmost flexibility in collecting tax obligations of this nature. This intent is clearly inconsistent with the "safe harbor" concept espoused in the majority opinion.

For the foregoing reasons, I respectfully dissent from the majority's reliance on § 32.200, art. V, § 2 as substantive taxation law, and the resulting conclusions that (a) an exemption certificate must be received and accepted in "good faith," and (b) if so received and accepted, sellers are relieved of all liability for sales tax. In all other respects, I concur in the majority opinion.

tional assessment of tax due from the seller. When the seller has been determined to *have acted not in good faith*, both seller and purchaser will be held liable until all liabilities have been satisfied.

\* \* \* \* \* \*

(5) A seller who *accepts, in good faith*, a signed exemption certificate from the purchaser as authorized under this rule *is relieved of all liability on account of any erroneous claim of exemption and the purchaser or other person claiming exemption will be solely responsible for all taxes, interest and penalty due*. (Emphasis added).

In 12 CSR 10–3.534, it is provided:

(1) In order for a seller to qualify for any deduction, s/he must *in good faith accept an exemption certificate* of a type approved by the Department of Revenue, delivered by a purchaser who resells tangible personal property in the ordinary course of business.

(2) If a seller sells tangible personal property or *taxable services free of the sales tax* on resale exemption certificate which s/he *does not accept in good faith*, the seller remains liable for tax. (Emphasis added).

And finally, 12 CSR 10–3.536 declares:

(1) When a seller *reasonably accepts in good faith any exemption certificate* that a person is purchasing the item under the exemption claimed, the certificate shall be evidence that the proceeds from the transaction are deductible from the seller's gross receipts. The burden of proving that a sale of tangible personal property, services, substances or things was not a sale at retail subject to the sales tax shall be upon the seller who made the sale.

(2) The furnishing of an exemption certificate to a seller by a buyer constitutes a claim by the buyer that the sale is exempt from sales tax. If the claim is found to be improper, the seller

remains liable for the tax but the Department of Revenue may proceed against the buyer. If the department collects the tax from the buyer, then the seller is entitled to a credit against the amount due from the seller on that purchase. (Emphasis added; citations deleted).

As noted in the main text, § 144.210.1 merely provides that a "seller shall obtain and maintain exemption certificates signed by the purchaser or his agent as evidence for any exempt sales claimed...." It makes no mention of *good faith receipt and acceptance of such certificates*. However, it goes on to declare that "when a purchaser has purchased tangible personal property or services sales tax free *under a claim of exemption which is found to be improper*, the director ... may collect the ... tax from the purchaser directly." The statute does not specify what constitutes an *improper claim*, or how it is to be determined.

Without opining on the subject, it could be argued that the director, by virtue of the provisions of § 144.270, was authorized to promulgate a rule for determining whether a claim of exemption is *improper* under § 144.210.1, and she reasonably required that for such purpose, it must be established that a seller *accepted and received the exemption certificate in good faith*, and she did so by adopting the rules above quoted. If such an argument were successful, the "good faith" language in the majority opinion might be sustainable under and by virtue of those rules, rather than § 32.200, art. V, § 2. On the other hand, an argument that the director was authorized to adopt 12 CSR 10–3.192(5), relieving a seller of all liability for tax when an exemption certificate is received in good faith, could be suspect since § 144.210.1 expressly provides otherwise. Of course, this issue is not before the Court.