**BOLIVAR ROAD NEWS, INC., Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent.**

**No. SC 81924.**

Supreme Court of Missouri, En Banc.

March 21, 2000.

Robert W. Stillings, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for respondent.

ANN K. COVINGTON, Judge.

Bolivar Road News, Inc., (Bolivar) seeks review of the decision of the Administrative Hearing Commission (AHC) that Bolivar is subject to sales tax and interest for the period of October 1, 1994, through September 30, 1997, on funds collected from sales of tokens for adult video booths because Bolivar operated "places of amusement and entertainment" within the meaning of section 144.020.1(2).[1] The decision of the AHC is affirmed.

The standard of review is set forth in section 621.193, which requires the Court to uphold the decision of the AHC when its decision is "authorized by law and supported by competent and substantial evidence upon the whole record." Sec. 621.193; see also Mo. Const. art. V, sec. 18; All Star Amusement, Inc. v. Director of Revenue, 873 S.W.2d 843, 844 (Mo. banc 1994).

The evidence reflects that Bolivar operated its business in two locations in the Springfield area. At each location, the word "Arcade" was printed in large letters on the front windows. Signs outside both locations read, "Adult Magazines, Novelties & Videos." Both locations sold these items. At both locations there were partitioned booths in which customers paid to view portions of adult videos sold in the store. Bolivar sold the videos for $14.95 to $29.95. Customers were charged sales tax on the sales of the videos. According to Bolivar's business manager, the video booths were intended to allow customers to preview the quality of a video before purchasing it. Bolivar did not limit the time a customer could spend in a video booth. Bolivar did not require any customer to purchase previewed videos.

At one of the business locations, there were thirteen operational booths. They were located in a room separate from the rest of the business. At the other location, there were eleven booths, five of which were located in a segregated area used exclusively for video booths and six of which were located in a separate room. Signs above the areas where the booths were located read, "Arcade." Each booth measured thirty by thirty-six inches. Each contained a television set, a coin box for inserting tokens, and an unpadded, backless stool that rested against the side wall of the booth. Only one person was allowed in the booth at any time, and merchandise was not allowed in the arcade.

Each morning, the opening store clerk selected twelve videos for viewing in the booths. The twelve videos ran continuously throughout the day and automatically rewound. To view a video, a customer purchased tokens from a machine located in the arcade. A customer received four tokens for one dollar or twenty-four tokens for five dollars. Most customers purchased one dollar's worth of tokens at a time. Each token allowed a customer to view portions of adult videos for forty-five seconds. When a customer inserted a token into the coin box in the viewing booth, the customer could switch channels on the television set and view any one of the twelve videos that were playing. A customer could not rewind or fast-forward any of videos. Viewing commenced wherever the film was in the continuous play

---

1. All statutory citations are to RSMo 1994, unless otherwise stated.

process. A customer could insert a maximum of fifteen tokens at one time. After the viewing time for the fifteen tokens expired, the television automatically turned off and a customer had to insert additional tokens to continue viewing. A customer had to wait ten to fifteen seconds before the television turned on to view more of the videos. The customer missed portions of the movie while inserting coins and waiting for the television to turn on. The manager of Bolivar testified that he did not know of anyone's having purchased tokens for the purpose of viewing an entire video. Bolivar did not provide a refund for unused tokens. The purchase of tokens yielded neither a credit nor a discount on the subsequent purchase of a video.

The director of revenue conducted an audit of Bolivar's records for the period of October 1, 1994, through September 30, 1997. It is not disputed that Bolivar paid sales tax on videos sold at its two business locations. Bolivar did not pay sales tax on its receipts from the video booths. In its bookkeeping, Bolivar recorded the video booth receipts under the heading, "Arcade Receipts." The arcade receipts amounted to forty-six percent of Bolivar's total gross sales for the thirty-six month audit period. At some point prior to the audit period, the company removed video games, pinball machines, and pool tables from each location because an attorney advised the company that, if it had fewer than fifteen coin-operated devices at each location, receipts from those devices would probably not be subject to sales tax.

At issue in this case is whether Bolivar is subject to sales tax on tokens sold for the viewing of adult videos at each of its business locations during the audit period, pursuant to section 144.020.2(1), because Bolivar's business locations constituted places of amusement.

Section 144.020.1 provides in pertinent part:

1. A tax is hereby levied and imposed upon all sellers for the privilege of engaging in the business of selling tangible personal property or rendering taxable service at retail in this state. The rate of tax shall be as follows:

. . .

(2) A tax equivalent to four percent of the amount paid for admission and seating accommodations or fees paid to, or in any place of amusement, entertainment or recreation, games and athletic events;

■ The director of revenue promulgated 12 CSR 10–3.176,[2] which interprets the sales tax law as it pertains to fees paid in places of amusement or entertainment. The regulation defines a place of amusement as "any location in which amusement activities comprise more than a *de minimis* portion of the business activities of the location. . . ." 12 CSR 10–3.176.1(A). The regulation is "a proper interpretation of section 144.020.1(2)," as it pertains to coin-operated amusement devices. *L & R Distrib. Co., Inc. v. Missouri Dept. of Revenue,* 648 S.W.2d 91, 96 (Mo. banc 1983).

Bolivar argues that it did not operate places of amusement or entertainment but, rather, sold adult videos, magazines, books, and novelty items. Bolivar alleges that it operated the video booths to allow customers to preview videos available for sale. Bolivar contends that the video booths did not provide amusement for customers, and that, if they did, amusement activities did not comprise more that a *de minimis* portion of Bolivar's total business activities during the audit period.

■ The elements required for taxability under section 144.020.1(2) are: (1) an amount or fee is paid for admission or seating; (2) the amount or fee is paid to or in a place; and (3) the place is one "of amusement, entertainment or recreation. . . ." *See* sec. 144.020.1(2); *Columbia*

2. All references to regulations are from the 1991 version of the Code of State Regulations.

*Athletic Club v. Director of Revenue,* 961 S.W.2d 806, 808 (Mo. banc 1998). The parties do not dispute the first or second elements. Bolivar asserts that the facts of this case do not satisfy the third element because neither Bolivar business location constituted a "place of amusement, entertainment or recreation."

■ In order to ascertain whether Bolivar operated places of amusement, it is first necessary to define "amusement activity" and then to determine whether such activity took place at the Bolivar business locations. The regulation defines amusement as "a pleasurable diversion or entertainment." 12 CSR 10–3.176.1(B). An "amusement activity," therefore, is an activity that is or provides a pleasurable diversion or entertainment. The record reflects that Bolivar proclaimed to sell adult videos for entertainment purposes. Bolivar also sold tokens that allowed customers to view portions of those entertaining videos. Viewing of adult videos, even for a limited period of time, falls within the purview of entertainment. The activity that took place in the arcade area at Bolivar's locations fits squarely within the definition of "amusement activity".

■ The next question is whether the amusement activity comprised more than a *de minimis* portion of Bolivar's business activities. *See* 12 CSR 10–3.176.1(A). The phrase *de minimis* refers to matters that are very small or trifling. *See* BLACK's LAW DICTIONARY 431 (6th ed.1990). As used in 12 CSR 10–3.176.1, *"de minimis"* refers to a minimal or insignificant portion of Bolivar's business activities. The amount of revenue generated by an amusement activity and the pervasiveness of the activity are relevant in ascertaining the role the amusement activity at issue here played in Bolivar's business enterprises. *Spudich v. Director of Revenue,* 745 S.W.2d 677, 681 n. 1 (Mo. banc 1988).

■ The amount of revenue generated by the video booths during the audit period indicates that the amusement activity comprised more than a *de minimis* portion of Bolivar's business activities. During the thirty-six month audit period, Bolivar derived forty-six percent of its total business revenues from the arcade. Although comparative amounts of revenue derived from recreational elements of a business are not dispositive of the issue of whether a facility is a place of amusement, revenue provides an objective assessment of the significance of coin-operated video machines to Bolivar's business. The fact that revenue from the sale of items in the merchandise section of Bolivar's facilities exceeded the revenue from the arcade does not vitiate the character of Bolivar's facilities as places of amusement. *See Spudich,* 745 S.W.2d at 681.

The facts that Bolivar devoted a portion of each business location exclusively to the arcade area and advertised the arcade on the windows and inside each business location also indicate that the video booth portion of the business was significant. Bolivar maintained the arcade area as a place where customers could view portions of adult videos. Merchandise was not allowed in the arcade area, and only tokens for the video booths were sold inside the arcade. The space and advertising devoted to the arcade, therefore, lead to the conclusion that the amusement activity comprised more than a minimal, or *de minimis,* portion of Bolivar's business activities.

The manner in which Bolivar held itself out to the public is another factor to consider in determining whether Bolivar operated places of amusement. *Spudich,* 745 S.W.2d at 681 n. 1. At each location, the word "Arcade" was printed in large letters on the front windows. "Arcade" signs hung above the area in which the video booths were located. An arcade is, by definition, "an amusement center having coin-operated games." *See* MERRIAM-WEBSTER's COLLEGIATE DICTIONARY 100 (10th ed.1993). Bolivar's signs, therefore, reflect that Bolivar held itself out, at least in part, as being a place of amusement.

Bolivar asserts that the arcade signs on the stores' windows and above the video booth areas were outdated and should not be used to identify the nature of the partitioned area. Bolivar contends that the video booth areas were not really arcades because they did not contain coin-operated games. Bolivar further states that the video booths merely allowed customers to preview the quality of videos available for purchase and were not meant to provide customers with entertainment.

 As set forth above, the record compels a contrary decision. Despite Bolivar's claim that it did not operate places of amusement, individuals associated with Bolivar continued to use "arcade" to describe the video booth areas. Bolivar's bookkeeping records denominated proceeds from the video booths as "Arcade Receipts." Bolivar provided only the self-serving and subjective claims of its own representatives for the proposition that the video booths and the arcade area were not or should not be regarded by the public as amusement places. "Such post-tax assessment declarations are suspect and may be rejected by the AHC," without this Court's finding an abuse of discretion. *Kanakuk–Kanakomo Kamps v. Director of Revenue*, 8 S.W.3d 94, 98 (Mo. banc 1999).

Bolivar further contends that it did not operate places of amusement because the primary purpose at each of its locations was to sell adult videos, magazines, books, and novelty items, citing *Columbia Athletic Club v. Director of Revenue*, 961 S.W.2d 806, 811 (Mo. banc 1998). The contention is without merit. Because the statutory language clearly applies to the activity at issue here, the question of primary purpose need not be reached.

In sum, the viewing of portions of adult videos constitutes an amusement activity. Bolivar sold tangible personal property, tokens for the viewing of adult videos, at its business locations, where arcade areas were committed exclusively for an amusement activity. The amusement activity comprised more than a *de minimis* portion of Bolivar's business activities. Bolivar, in addition, held itself out to the public as an arcade, which is, by definition, a place of amusement. Pursuant to section 144.020.1(2), Bolivar is subject to sales tax and statutory interest for the period of October 1, 1994, through September 30, 1997.

The decision of the AHC is affirmed.

All concur.