The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**

**Filing Date:** January 16, 2024

**NO. S-1-SC-38681**

**CCA OF TENNESSEE, LLC,**

　　　　Appellant-Respondent,

v.

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT,**

　　　　Appellee-Petitioner.

**IN THE MATTER OF THE PROTEST**
**TO ASSESSMENT ISSUED UNDER**
**LETTER ID. NO L1081049392**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Chris Romero, Hearing Officer**

Hector H. Balderas, Attorney General
New Mexico Taxation and Revenue Department
David E. Mittle, Special Assistant Attorney General
Santa Fe, NM

for Petitioner

Sutin, Thayer & Browne, P.C.
Suzanne W. Bruckner
Andrew J. Simons
Wade L. Jackson
Albuquerque, NM

for Respondent

**OPINION**

**ZAMORA, Justice.**

{1}     The issue on appeal is whether taxpayer CCA of Tennessee, LLC (CCA), a private prison corporation, accepted in good faith a nontaxable transaction certificate (NTTC) executed by Torrance County (the County) for CCA's housing of federal prisoners at the Torrance County Detention Center (the Detention Center). An NTTC establishes a taxpayer's entitlement to claim a deduction for the gross receipts it receives from the sale of certain licenses or services. NMSA 1978, § 7-9-43(A) (2011, amended 2018); NMSA 1978, § 7-9-47 (1994, amended 2021); NMSA 1978, § 7-9-48 (2000, amended 2021).[1] The issuance of an NTTC for such sales is predicated on the buyer reselling the license or services it purchased from the taxpayer. Section 7-9-47; § 7-9-48. When the taxpayer accepts a properly executed NTTC in good faith, the NTTC is conclusive evidence that the proceeds are deductible from that taxpayer's otherwise taxable gross receipts. Section 7-9-43(A). Generally speaking, this provides the taxpayer with safe harbor protection from

---

[1] The relevant activity in this case occurred before Sections 7-9-43, 7-9-47 and 7-9-48 were amended in 2018, 2021, and 2021, respectively. Further reference to Section 7-9-43 is to the 2011 version of the statute; further reference to Section 7-9-47 is to the 1994 version of the statute; further reference to Section 7-9-48 is to the 2000 version of the statute.

liability for payment of gross receipts tax in situations where, unbeknownst to the seller, the buyer is not reselling the license or services in the intended manner. *See* § 7-9-43(A).

{2}     The administrative hearing officer for the New Mexico Taxation and Revenue Department (the Department) concluded that CCA, as the seller, did not in good faith accept the NTTC, executed by the County as buyer, and therefore was not entitled to the deduction from gross receipts it received for housing federal prisoners. *See id.* The Court of Appeals came to the opposite conclusion. *CCA of Tenn. v. N.M. Tax'n & Revenue Dep't*, A-1-CA-37548, mem. op. ¶ 27 (N.M. Ct. App. Jan. 21, 2021) (nonprecedential).

{3}     We agree with the conclusion of the hearing officer and hold that under the plain language of Section 7-9-43(A), CCA did not accept the NTTC in good faith and is therefore not entitled to safe harbor protection from the payment of gross receipts tax. We reverse the Court of Appeals.

**I.      BACKGROUND**

{4}     CCA owned and operated the Detention Center during the times relevant to this appeal. CCA incarcerated inmates for the County at the Detention Center pursuant to the contract it executed with the County in 2010. The contract required CCA to provide services for booking inmates, safekeeping inmate property, medical

care, transporting inmates, and supervising inmate work programs. Some years earlier, in 2002, the County had entered into a separate contract with the United States Marshals Service (Marshals Service) to house federal prisoners. CCA agreed to fulfill the County's obligation to the Marshals Service to house and supervise federal prisoners at the Detention Center. CCA directly invoiced, and directly received payments from, the Marshals Service for housing federal prisoners.

{5}     CCA sought a refund of gross receipts taxes from the Department that it had purportedly overpaid from January 1, 2010, through December 31, 2012, on the gross receipts it received from the Marshals Service. To secure that refund, CCA needed the Department to issue an NTTC to the County, which the County would then execute with CCA. *See* Section 7-9-43(D). CCA's tax advisor communicated with an audit bureau chief in the Department about the NTTC. In email correspondence with the Department's audit bureau chief, CCA's tax advisor wrote: "Just to clarify, the NTTC relates to the portion of Torrance County receipts derived from housing [Marshals Service] inmates. The receipts are not coming directly from the [Marshals Service] to CCA." CCA concedes that this was a misstatement because the Marshals Service was sending payments directly to CCA. In reliance on CCA's assertion that the receipts were not coming directly from the Marshals Service to CCA, the Department's audit bureau chief informed CCA's tax advisor

3

that CCA could accept an NTTC for the receipts derived from housing the Marshals Service inmates.

{6} The Department issued the requested NTTC and the County executed an NTTC to CCA in August 2013 for the gross receipts from CCA's purported sale of a license for housing federal prisoners at the Detention Center. CCA then filed for a tax refund for the years 2010-2012 asserting it was entitled to a deduction under Section 7-9-47 for the sale of a license to the County to use the Detention Center, which the County resold to the Marshals Service to house federal prisoners. In April 2014, CCA received the requested refund.

{7} In August 2016, the Department conducted an audit of CCA for 2010 through September 30, 2015. The auditor concluded that CCA was not entitled to the refund it had received for gross receipts tax paid on the 2010-2012 receipts from the Marshals Service and that it was liable for gross receipts tax in the amount of $2,686,632.18, plus penalties and interest. The auditor found that there was no resale of the license and that CCA was not entitled to a tax deduction because CCA was selling services, not a license. CCA protested the audit. The hearing officer held a hearing on CCA's protest and issued a decision and order denying the protest. In the decision and order, the hearing officer first determined that CCA was not entitled to a tax deduction under Section 7-9-47, which was predicated on the County reselling

a license to use the Detention Center to the Marshals Service in the ordinary course of the County's business.[2] The hearing officer found that the predominant feature of the transaction—to house federal prisoners—was not the licensing of an interest in real property. Instead, the predominant feature was the provision of services within the building, such as providing adequate food, clothing, shelter, and medical care for inmates. The hearing officer found that there was not an agreement between the County and the Marshals Service for the resale of the license, and that there was no evidence that the County was reselling licenses in the ordinary course of its business. Therefore, the hearing officer concluded CCA was not entitled to its claimed deduction.

{8}    The hearing officer next analyzed whether CCA was nonetheless entitled to safe harbor protection under Section 7-9-43(A). Section 7-9-43(A) provides in relevant part that when a seller or lessor accepts a properly executed NTTC "in good faith that the buyer or lessee will employ the property or service transferred in a

---

[2] Section 7-9-47 states in relevant part:

Receipts from selling . . . licenses may be deducted from gross receipts . . . if the sale is made to a person who delivers a nontaxable transaction certificate to the seller. The buyer delivering the nontaxable transaction certificate must resell the . . . license . . . in the ordinary course of business.

nontaxable manner," the NTTC is "conclusive evidence" that the proceeds from that transaction can be deducted from the seller's gross receipts. To support its position, CCA relied on the email it received from the Department agreeing that CCA could accept an NTTC "for the receipts derived from hous[ing] the inmates." The hearing officer rejected as unreasonable CCA's reliance on this email because the facts the Department relied upon "were undeniably and undisputedly incorrect." The hearing officer observed that "safe harbor protection only applies when the underlying transaction is covered by a recognized deduction." He then concluded that because CCA's underlying transaction was taxable, "mere possession of an NTTC" did not transform it into a nontaxable transaction.

{9}     The Court of Appeals reversed the hearing officer, holding that "[a]bsent evidence that [CCA] did not accept the NTTC from the County in good faith," CCA was entitled to safe harbor protection under Section 7-9-43(A). *CCA of Tenn.*, A-1-CA-37548, mem. op. ¶ 27. We granted the Department's petition for certiorari to decide whether CCA accepted the NTTC in good faith and was therefore entitled to safe harbor protection under Section 7-9-43(A).[3]

---

[3] Neither party appeals the determination that CCA was selling services, not a license, and our analysis of the issue on appeal does not depend on this distinction. For ease of reference, we refer primarily to sales of goods and services and refer to sellers and buyers, though NTTCs can also be issued for license sales. *See* § 7-9-47.

6

## II.	DISCUSSION

### A.	Standard of Review

{10}	We will set aside a decision and order of an administrative hearing officer only if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7-1-25(C) (2015). Within that framework, we review issues of statutory interpretation de novo. *High Desert Recovery, LLC v. N.M. Tax'n & Revenue Dep't*, 2022-NMCA-048, ¶ 7, 517 P.3d 258. In reviewing the administrative hearing officer's decision "we apply a whole-record standard of review." *Gemini Las Colinas, LLC v. N.M Tax'n & Revenue Dep't*, 2023-NMCA-039, ¶ 11, 531 P.3d 622 (internal quotation marks and citation omitted); Section 7-1-25(A). We view the evidence in the light most favorable to the hearing officer's decision to determine whether that decision is supported by substantial evidence. *Vigil v. N.M. Tax'n & Revenue Dep't*, 2022-NMCA-032, ¶ 9, 514 P.3d 15.

### B.	The Plain Meaning of the Term "Good Faith" in Section 7-9-43(A) Includes the Facts and Circumstances Reasonably Known to the Seller When It Accepts an NTTC

{11}	The Department argues that the plain meaning of Section 7-9-43(A) "provides a clear answer to legislative intent—a seller must accept the NTTC in good faith— therefore, the statutory analysis begins and ends there." Based on its interpretation

7

of the plain language of the statute, CCA counters that the good faith requirement of Section 7-9-43(A) requires only "'the absence of intent to defraud or to seek unconscionable advantage'" (citation omitted). Under either party's formulation of the issue presented, we must first determine the meaning of "good faith" as it is used in Section 7-9-43(A).[4] This determination will guide our analysis of whether CCA has met its burden to overcome the presumption that the Department's assessment of gross receipts tax on the receipts CCA received from the Marshals Service for housing federal prisoners was correct. NMSA 1978, § 7-1-17(C) (2007); *Holt v. N.M. Dep't of Tax'n & Revenue*, 2002-NMSC-034, ¶ 4, 133 N.M. 11, 59 P.3d 491.

{12}     When construing statutes, we must determine and give effect to legislative intent. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047. "Under the rules of statutory construction, we first turn to the plain meaning of the words at issue,

---

[4] No New Mexico appellate court has previously addressed the definition of "good faith" in Section 7-9-43(A). Below, the Court of Appeals reversed in part the hearing officer's decision and order without analyzing the meaning of the term "good faith" in Section 7-9-43(A) and without considering how CCA's own actions affected whether CCA accepted the NTTC in good faith. The Court of Appeals has observed that "the good faith belief of the seller *may* rest solely upon the representations made by the buyer in the exemption certificate, as such reliance fulfills the function of exemption certificates." *Siemens Energy & Automation v. N.M. Tax'n & Revenue Dep't*, 1994-NMCA-173, ¶ 15, 119 N.M. 316, 889 P.2d 1238 (text only) (emphasis added) (citation omitted). But that general observation does not preclude inquiry into whether a seller's own actions comport with the good faith requirement of Section 7-9-43 (A).

often using the dictionary for guidance." *Griego v. Oliver*, 2014-NMSC-003, ¶ 21, 316 P.3d 865 (internal quotation marks and citation omitted); *see also* NMSA 1978, § 12-2A-2 (1997) (stating that the meaning of an undefined phrase in a statute is determined by its context, the rules of grammar, and common usage). When the language of a statute is clear and unambiguous, we give effect to that language and refrain from further statutory interpretation. *See State v. Barela*, 2021-NMSC-001, ¶ 6, 478 P.3d 875. The statute's text is "the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997). "However, if the plain meaning of the statute is doubtful or ambiguous, or if an adherence to the literal meaning of the words would lead to injustice, absurdity or contradiction, we will construe the statute according to its obvious spirit or reason." *Baker*, 2013-NMSC-043, ¶ 11 (brackets, internal quotation marks, and citation omitted). Tax statutes are "construed strictly in favor of the taxing authority." *Pub. Serv. Co. of N.M. v. N.M. Tax'n & Revenue Dep't*, 2007-NMCA-050, ¶ 32, 141 N.M. 520, 157 P.3d 85 (internal quotation marks and citation omitted).

{13}    Section 7-9-43(A) states:

> When the seller or lessor accepts a[n] [NTTC] within the required time and *in good faith that the buyer or lessee will employ the property or service transferred in a nontaxable manner*, the properly executed [NTTC] shall be conclusive evidence, and the only material evidence, that the proceeds from the transaction are deductible from the seller's or lessor's gross receipts.

(Emphasis added.) This section conditions safe harbor protection from taxation on the seller's good faith belief that the buyer will employ the property or service transferred in a nontaxable manner when the seller accepts an NTTC. In this context, the phrase "in a nontaxable manner" means that the buyer or lessee will resell the property, services, or license in a manner that will subject the second transaction to gross receipts tax. *See* § 7-9-47; § 7-9-48; 3.2.206.8(A) NMAC; 3.2.208.8(A) NMAC. If there is no resale, tax is due on the value of the services at the time they were initially rendered. *See, e.g.*, 3.2.206.8(A) NMAC.

{14}    The task at hand is construing the plain meaning of the statutory term "good faith" in a manner that gives effect to legislative intent. This term has been defined in an analogous taxation context by at least one other jurisdiction. *See, e.g.*, 12 Mo. Code of State Regulations § 10-101.500(2)(B) (2006) (defining *good faith* objectively as "[h]onesty of intention and freedom from knowledge of circumstances which ought to put the holder [of an exemption certificate] upon inquiry"); *Blevins Asphalt Const. Co. v. Dir. of Revenue*, 938 S.W.2d 899, 902 (Mo. 1997) (en banc) (affirming a company's sales tax liability on purchases for which it lacked evidence of a good faith belief in its holding of a state exemption). However, "good faith" is not defined in our Gross Receipts and Compensating Tax Act, NMSA 1978, §§ 7-9-1 to 120 (1966, as amended through 2023), or the Act's administrative regulations.

Accordingly, we apply the ordinary meaning of the term "good faith" in a manner that makes sense as to the statute as written. *See Pub. Serv. Co. v. N.M. Pub. Util. Comm'n*, 1999-NMSC-040, ¶¶ 16, 18, 128 N.M. 309, 992 P.2d 860.

{15} *Black's Law Dictionary* (11th ed. 2019) defines "good faith" as a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." It has been described as a term that is used in various contexts, with its meaning varying somewhat depending on the context. *See id.* (quoting Restatement (Second) of Contracts, § 205 cmt. a (1979)); *see also ERICA, Inc. v. N.M. Regul. & Licensing Dep't*, 2008-NMCA-065, ¶¶ 16, 18, 144 N.M. 132, 184 P.3d 444 (describing "good faith" as a "broad term" and relying on the same dictionary definition to determine whether a liquor licensee could avail itself of a statutory good faith defense when alcohol was served to a minor). To apply the ordinary meaning of "good faith," we first determine whether the inquiry into good faith is limited to an assessment of the seller's subjective belief that it acted in good faith or whether that inquiry can include an objective assessment of the relevant facts and circumstances reasonably known to the seller when it accepts an NTTC. *Cf. J.R. Hale Contracting Co. v. United N.M. Bank*, 1990-NMSC-089, ¶¶ 36-39, 110 N.M.

11

712, 799 P.2d 581 (reviewing subjective and objective standards to define the statutory term "good faith" in a section of the Uniform Commercial Code).

{16} The first clause of Section 7-9-43(A) provides context as to the kind of belief the safe harbor provision is intended to protect: the belief "that the buyer or lessee will employ the property or service transferred in a nontaxable manner." The corresponding regulation similarly focuses on the way the buyer employs the property or services sold to it:

> Acceptance of [NTTCs] in good faith that the . . . service sold thereunder *will be employed by the purchaser in a nontaxable manner* is determined at the time of each transaction. The taxpayer claiming the protection of a certificate continues to be responsible that the goods delivered or services performed thereafter are of the type covered by the certificate.

3.2.201.14(A) NMAC (emphasis added). Collectively, Section 7-9-43(A) and 3.2.201.14(A) NMAC indicate the purpose of the safe harbor provision: to protect sellers whose products or services are initially sold to buyers for a nontaxable purpose but where, unbeknownst to the seller, the buyers do not actually use those products or services in the required manner.

{17} Additional gross receipts tax regulations indicate that the assessment of a seller's good faith belief is not a purely subjective standard, which we have described as "the pure heart and the empty head standard." *J.R. Hale*, 1990-NMSC-089, ¶ 30

12

(internal quotation marks and citation omitted). In the context of sales of construction materials, a seller may not claim it accepted an NTTC in good faith pursuant to Section 7-9-43(A) "when the seller can *reasonably determine* that the tangible personal property sold will be incorporated into a construction project which will not be subject to gross receipts tax upon completion because it is located outside New Mexico." 3.2.209.23(A) NMAC (2000) (emphasis added). Reasonableness is an objective standard, *Est. of Gutierrez ex rel. Jaramillo v. Meteor Monument, LLC*, 2012-NMSC-004, ¶ 9, 274 P.3d 97,[5] and this regulation specifically includes it as a component of the good faith requirement of Section 7-9-43(A). We give deference to an agency's reasonable interpretation of its own regulation, *see Jicarilla Apache Nation v. Rodarte*, 2004-NMSC-035, ¶ 25, 136 N.M. 630, 103 P.3d 554, and our Legislature has specifically acknowledged that the administrative construction of a statute may be considered when determining the meaning of statutory text, NMSA 1978, § 12-2A-20(B)(4) (1997). The

---

[5] *Gutierrez* references instances where we have contrasted the subjective "good faith" standard with the objective "reasonable" standard. 2012-NMSC-004, ¶ 9 (citing *Shull v. N.M. Potash Corp.*, 1990-NMSC-110, ¶ 8, 111 N.M. 132, 802 P.2d 641, and *Kestenbaum v. Pennzoil Co.*, 1988-NMSC-092, ¶ 27, 108 N.M. 20, 766 P.2d 280). Neither *Shull* nor *Kestenbaum* are contrary to our analysis here. *Shull* and *Kestenbaum* concerned contractual wrongful termination claims. Neither case involved statutory construction or engaged in any analysis of the meaning of "good faith."

administrative regulations for gross receipts taxes support the inference that the Department understands that the term "good faith" in Section 7-9-43(A) requires an objective review of the facts and circumstances known to the seller at the time it accepted the NTTC. This approach is consistent with prior case law, where facts and circumstances reasonably known to the taxpayer were part of the good faith analysis under Section 7-9-43(A). *Cf. Arco Materials, Inc. v. N.M. Tax'n & Revenue Dep't*, 1994-NMCA-062, ¶¶ 10-11, 118 N.M. 12, 878 P.2d 330 (rejecting a taxpayer's Section 7-9-43(A) good faith claim that it had no continuing duty to assess validity of deductions made in reliance on an NTTC and holding that the taxpayer has affirmative duty to stay informed about tax changes that might affect its liability), *rev'd on other grounds by Blaze Constr. Co. v. N.M. Tax'n & Revenue Dep't*, 1994-NMSC-110, ¶ 22, 118 N.M 647, 884 P.2d 803.

{18} Cases from another jurisdiction interpreting similar safe harbor protections from tax liability offer additional support that the plain meaning of good faith in Section 7-9-43(A) requires an objective analysis based on the facts and circumstances known to the seller. *See* § 12-2A-20(B)(2) (1997) (stating that judicial construction of a similar statute by another jurisdiction may be used to determine the common usage of a phrase in a statute). The Missouri Supreme Court described the

14

purpose of exemption certificates when it determined that a seller did *not* accept an exemption certificate in good faith:

> Exemption certificates, received and accepted in good faith, protect sellers, who may know little or nothing about the facts upon which an exemption is claimed, from the obligation to investigate all buyers who may claim exemption because of their status or because of the intended use for purchases. Buyers, by signing the certificate, are alerted that they must be prepared to prove claims of exemption, because buyers are secondarily liable for the tax if the claim of exemption is improper.

*Conagra Poultry Co. v. Dir. of Revenue*, 862 S.W.2d 915, 918 (Mo. 1993). Noting Missouri's adoption of a relevant part of the Multistate Tax Compact and citing *Conagra*, *id.*, the Missouri Supreme Court stated further that "good faith receipt of an exemption certificate requires that a seller honestly believe that the buyer is exempt from paying the sales tax." *All Star Amusement, Inc. v. Dir. of Revenue*, 873

S.W.2d 843, 844-45 (Mo. 1994).[6] To provide safe harbor protection to a seller in Missouri, the transaction must be nontaxable based on the facts reasonably known to the seller at the time of the transaction. *See id.* at 845 (if the seller has information or knowledge that should raise doubts, "the seller must investigate to the point that it is honestly convinced that the buyer or the transaction is exempt.")

{19}   The Missouri Supreme Court looked to the plain language of the statute at issue, which similarly required that exemption certificates be accepted in good faith by the seller. *Conagra*, 862 S.W.2d at 917-18. There, as here, the burden was on the taxpayer to prove that its sale was exempt from taxation. *See Holt*, 2002-NMSC-034, ¶ 4 (stating that the taxpayer bears the burden to overcome the presumption that Department's assessment or demand for payment was correct).

---

[6] NTTCs serve the same purpose for intrastate transactions that Multistate Tax Compact Uniform Sales and Use Tax Certificates serve for interstate transactions. *Siemens Energy & Automation v. N.M. Tax'n & Revenue Dep't*, 1994-NMCA-173, ¶¶ 2, 16, 119 N.M. 316, 889 P.2d 1238. The Multistate Tax Compact's safe harbor provision states, "Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate . . . the vendor shall be relieved of liability for a sales or use tax with respect to the transaction." NMSA 1978, § 7-5-1, Multistate Tax Compact art. V, part 2 (1967). New Mexico is one of fifteen states plus the District of Columbia that have enacted the Multistate Tax Compact into their existing law. *Member States*, Multistate Tax Commission, https://www.mtc.gov/The-Commission/Member-States (last visited Jan. 2, 2024). Thus, other member states' interpretations of the safe harbor provision of the Multistate Tax Compact's safe harbor provision can be persuasive.

{20}    In *Conagra*, the taxpayer purchased and delivered wood shavings to turkey farmers, which the farmers used to absorb turkey droppings. 862 S.W.2d at 916. Once the shavings absorbed a sufficient amount of droppings, the combined shavings and droppings were used to fertilize the farmers' crops. *Id.* The taxpayer claimed that it was exempt from paying sales tax on the transfer of the shavings to the farmers because it was providing a component ingredient of fertilizer and fertilizer was exempt from Missouri sales tax. *Id.* The Missouri Supreme Court held that the taxpayer was not entitled to the exemption because components of fertilizer were not included in the tax deduction for fertilizer. *Id.* at 917-18. In addition, the *Conagra* Court held that the taxpayer had not accepted exemption certificates from the farmers in good faith, reasoning that the taxpayer was "well aware of the facts underlying the transactions from the outset," and the taxpayer—and not the farmers—prepared the exemption certificates. *Id.* at 918. The taxpayer in *Conagra* had all the information necessary to know that the deduction it claimed was not applicable to the transaction, and a reasonable taxpayer in the same circumstances would not have believed it qualified for a deduction. Thus, the taxpayer did not accept the exemption certificate in good faith.

{21}    We find the reasoning of the Missouri Supreme Court persuasive. If the buyer, unbeknownst to the seller, does not use the products or services sold in a nontaxable

manner, the seller is protected by the safe harbor provision from liability for the gross receipts tax and does not have an obligation to investigate buyers "who may claim exemption because . . . of the intended use for purchases." *Id.* Alternatively, if under all the facts and circumstances known to the seller, the transaction between the seller and buyer does not fit the deduction described in an exemption certificate, the seller cannot accept in good faith a certification for the transaction. *Id.* (determining that the taxpayer "was well aware of the facts underlying the transactions from the outset"); *cf.* 3.2.201.14(A), (C) NMAC (providing that the seller can demonstrate good faith acceptance of an NTTC with a statement from a responsible employee of the buyer indicating that the transaction is eligible for the deduction *if* the seller does not know that the statement is false).

{22}   The clear and unambiguous language of Section 7-9-43(A), the corresponding gross receipts and compensating tax regulations, and the persuasive interpretation of a similar safe harbor provision by the Missouri Supreme Court lead us to conclude that in applying an objective standard to the "good faith" requirement in Section 7-9-43(A), we are giving proper effect to legislative intent. The good faith standard in the safe harbor provision in Section 7-9-43(A) protects sellers from tax liability when buyers do not use goods or services in the intended manner. It does not protect a seller who is fully aware that the goods or services it sells are not being utilized by

the buyer in the manner justifying the issuance or execution of the NTTC. This is an objective standard, based on the facts and circumstances reasonably known to the taxpayer at the time of the transaction. It relies on the ordinary meaning of "good faith," which here is most simply expressed as honesty in belief or purpose.[7]

## C. CCA Is Not Entitled to Section 7-9-43(A) Safe Harbor Protection

{23} We review whether CCA accepted the NTTC in good faith given its misstatement to the Department that the receipts from housing federal prisoners did not come directly to CCA from the Marshals Service. CCA acknowledges that "[t]he question now is whether CCA's misstatement precluded CCA from accepting the County's NTTC in good faith under Section 7-9-43(A)" and argues that it accepted

---

[7] In the current statute, the good faith language is simplified and placed in its own, separate subdivision. That subdivision states in its entirety, "When a person accepts in good faith a properly executed nontaxable transaction certificate from the purchaser, the properly executed nontaxable transaction certificate shall be conclusive evidence that the proceeds from the transaction are deductible from the person's gross receipts." Section 7-9-43(D) (2018).

Though the language has been streamlined, the Legislature still conditions the safe harbor protection of Section 7-9-43 (2018) on the taxpayer's good faith acceptance of a properly executed NTTC. The determination that the proper standard of review to determine good faith under Section 7-9-43(A) (2011) is an objective one is not affected by the more streamlined language of Section 7-9-43(D) (2018). Even without the specific language of Section 7-9-43(A) (2011), the analysis leading to the adoption of an objective standard to determine whether a taxpayer accepted an NTTC in good faith is supported by the plain meaning of the term "good faith," without additional explanatory language, as well as by the case law and regulations discussed in the body of this opinion.

19

the NTTC in good faith because "there is no evidence that CCA's misstatement was either knowing or otherwise intentional."

{24} We apply an objective standard based on the facts and circumstances reasonably known to CCA at the time it accepted the NTTC and assess whether the hearing officer's conclusion that CCA is not entitled to safe harbor protection of Section 7-9-43(A) was (1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence; or (3) otherwise not in accordance with the law. Section 7-1-25(C). The Department argues that the Court of Appeals misapplied the law and that substantial evidence supports the hearing officer's conclusion that CCA did not accept the NTTC in good faith. CCA argues that the Court of Appeals' legal analysis was correct and that the hearing officer's conclusion is contrary to law and conflicts with the plain meaning of Section 7-9-43(A).

{25} Relying on the plain language of the statute, the parties looked only to the fourth common definition of "good faith"—the "absence of intent to defraud or to seek unconscionable advantage"[8]—and confined most of their arguments on this point to the alleged subjective state of mind of CCA. But as we have just determined, the applicable legal standard is an objective one, where the determination of whether

---

[8] *Good faith*, *Black's Law Dictionary* (11th ed. 2019).

20

a taxpayer accepts an NTTC in good faith is based on the facts and circumstances reasonably known to the taxpayer at the time it accepted the NTTC. On the facts of this case, our focus is on whether CCA accepted the NTTC with a good faith belief that the County was reselling to the Marshals Service the services CCA provided.

{26}   The analysis here is straightforward. To help facilitate the issuance of an NTTC by the Department, CCA's tax advisor, just "to clarify," explained that "the NTTC relates to the portion of Torrance County receipts derived from housing [Marshals Service] inmates. The receipts are not coming directly from the [Marshals Service] to CCA." In reliance on CCA's assertion that the receipts were *not* coming directly from the Marshals Service to CCA, the audit bureau chief responded to CCA's tax advisor that an NTTC would be appropriate. CCA made these representations despite the fact it directly invoiced the Marshals Service for the housing of federal prisoners and received payment directly from the Marshals Service for the provision of those services. These facts are supported by the evidence and testimony presented at the hearing before the hearing officer, who issued findings of fact on each of these points. CCA conceded that its tax advisor made a misstatement of fact to the Department because the Marshals Service was sending payments directly to CCA. These facts were known to CCA when it accepted the NTTC and preclude any honest belief by CCA that its services were being resold.

{27}    Based on the foregoing, we conclude that the hearing officer's determination that CCA did not accept the NTTC in good faith is supported by substantial evidence and was not arbitrary, capricious, or an abuse of discretion. CCA knew that there was no resale of services or a license because it was directly billing the Marshals Service, that the Marshals Service was paying CCA directly, and that the Department relied on CCA's misstatement in issuing the NTTC. Therefore, CCA did not, on the facts and circumstances known to it, accept the NTTC in good faith.

## III.    CONCLUSION

{28}    For the reasons set forth above, we reverse the Court of Appeals' holding that CCA was entitled to safe harbor protection under Section 7-9-43(A) and we affirm the administrative hearing officer's decision.

{29}    **IT IS SO ORDERED.**

_____
**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____
**C. SHANNON BACON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

22

_____

**DAVID K. THOMSON, Justice**


_____

**GEORGE P. EICHWALD, Judge**
**Sitting by designation**